The first case for argument this morning is 14-1746, Meng v. Chu, and I think we've got everybody straight in terms of who's arguing when, right? Okay, and Mr. Perry, you're first and you are representing. Please proceed. Meng's position in this appeal is straightforward. Conception of the inventions claimed in the patents in suit cannot take place until there's actual reduction to practice. Second, the clear and convincing evidence in the case in the trial record is that Meng was responsible for the actual reduction to practice. Six of the claims in the patents, in the two patents, are method claims which actually cover the work that she did to create the superconducting compounds. Is there anything about the synthesis work that your client did that requires more than the exercise of ordinary skill in the art? Everything about the synthesis process requires more than the ordinary skill in the art. Where do we find that? Because I've read her testimony and I don't find a description in there of any work that went beyond ordinary skill. The work that she did involved applying a known method, the solid state reaction method, to these compounds through trial and error to develop the conditions which would create a superconducting compound. Right, but where do we find in the record that that involves something of more than ordinary skill? I would look to the, first I would look to the patents in that the methods in claims 11 to 15 of the 866 patent and I believe claims 4 and 5 in the 418 patent, the work that she did was found to be was found to be worthy of a claim in the patent, to be patentable. And the method that she, the method itself was patented. I don't, the process, I understand, the process involves heating and cooling, it involves grinding small amounts of material and mixing them in prescribed formulas and I don't know that all of the, that any single element is hard to explain at this point 30 years later, but when they were, when they were doing this 30 years ago, no one, no one else was, she was the only person responsible for creating the compounds. Well, what's an example of a method claim that you say reflected her work that was found to be patentable? Claim 11. This is the 866 patent? The 866 patent, yes. What is patented is a superconducting metal oxide comprising the steps of, and then the steps are, and then the steps are described. And she was responsible for developing and describing those steps. And if those steps are not followed, then the resulting compound is either, either degenerates or has nothing more than insulating capacities. I can't cite to the specific point. And what corroboration, I mean, taking what you say at face value, what is the corroboration? Her lab records, which are, her lab notes, which are contemporary, which are contemporaneous documentation of her work. We have the testimony of Dr. Ken Forrester, who was working in the lab at that time and observed her work, and the testimony of Christopher Kenelidis, who worked with her to, through repeated processes, to produce better and better samples so that they could, so that they could improve the superconducting properties. But my problem with, with Claim 11 is that it seems to me it's directed to using one of these rear, magnetic rear earth metals as a about the claim rather than the actual method of processing. In other words, what we have here is a situation in which Chu says that he thought of making the complete substitution using the magnetic earth metals, and that that was what was inventive, and that the implementation of that was just routine. And I'm not sure that this patentability of Claim 11 suggests that the implementation, as opposed to the implementation with respect to specific metals, is something that's novel. I, I appreciate that that's, I appreciate that that's Dr. Chu's position, Ms. Ming's position, and if I can't convince you, then I, then I can't convince you. The, and I don't win this appeal. Well, you're not going to, something you say today isn't going to convince you. No, I understand. Unless, I mean, what we'd like you to do is point to something in the record that would establish the burden was your client's, as you know. No, I, there, there is no, there is no expert testimony that came in and established that the, that the work that she did was, I, I, that, that the work she did was, it was either in the, in, I'm sorry, I'm not normally a patent lawyer, so I'm going to misuse terms, but that it was known art. What we did have was testimony from Dr. Forrester, who said he observed that Ruling's work was crucial to the inventive process in, in the lab. We also heard. Where, where did he say that? What's the page? I, I don't have the citation, Your Honor. I can, I can provide that. Let me ask you. Yes. Something that bothers me in particular. The district court found that Ms. Ming's testimony, and, and what bothers me is page 4457 in the record. Yes. Where she signed a sworn declaration crediting him, she says, she credited Dr. Chu with her testimony. It's, it's directly, it's diametrically opposed to her later testimony. And her, her explanation that is, I was being nice. I, I don't think that's her full explanation, Your Honor. Her, for Ms. Ming, English is her second language. She had not been in the United States for very long at that point. There was, it's hard to go back to the time when this occurred, but there was intense public scrutiny of everything that went on related to these inventions. And she was, she, she was under, under pressure to do, to assist, she, to assist the University of Houston in protecting its claims in the interference action that you're referring to. I, I, I don't know. She, she testified in court extensively about the discussion they had over whether to use the solid state regimen. I read the testimony. Yes. And I, her, her testimony was, I was, this was put in front of me. I was not interviewed for it. It was put in front of me, and I was asked to sign it, and I did. Certainly the district court could have disbelieved her based on that conflicting testimony. Yes, I don't think we're, I think that there's conflicting evidence over who suggested the use of the solid state reaction method. What I don't think there's conflicting evidence over is that Ruling Ming was responsible for taking the... So you concede, you concede that point, then, in what you're doing. I, I concede that there is, that there is... evidence for the district court to have ruled the way he did. I, I don't understand the district court's ruling. The district court lays out the presentations by both sides and, and then in the end just says that, I was saying in the end just says that there's, there's no way to decide whether she's an inventor or not. Yeah, we don't, we don't have, what you're saying is we don't have findings that might be helpful here from the district court as to actually what happened. Well, we do have the finding that she was the only, they're, they're not really findings, they're just recitations of testimony, but we do have a finding that she was the only material scientist that, that Ming was responsible, that Dr. Chu admitted that Ming was responsible for helping him describe the synthesis process and that the method used in The, the issue, the issue is, and I, I mean, I think that the, that this court's opinion in Felana is, is what matters most to, to Ms. Ming, and it is that without the work that she did, there would be no superconductors. And that's, there was, there, and her, while her work may seem standard practice today, when it occurred in 1987, it was, it was not. It was intended. Well, that, that would be pretty interesting if there were testimony to that effect, but I don't see the testimony that says in 1987 this was something other than Ming. I, I can, I, Dr. Forrester said that in his testimony, and, I mean, ruling, ruling Ming said it in her testimony. I realize she can't corroborate her own. I don't, I didn't see where she said that in her testimony. Where did she say that? I, I don't. I, I would have, I would have to go back and look at it. Well, maybe if you have time between now and the time we see you again in a few minutes, you'll be able to identify some changes in the appendix that support what you're saying. Why don't we hear from Mr. Beverley? May it please the court, I'm Jay Beverley. I represent Dr. Pei-Hern Hoar. Obviously, this case involves very complex scientific issues, limited time for discussion here, so I'm going to focus on the essential corroboration facts which corroborate Dr. Hoar's claim to have invented the magnetic rare earth line of high temperature superconductors. Can I ask you something? Just, just to really, just back to the basics. Sure. Dr. Chu did the partial replacement, right? Well, I think that... Sometime in, at the end of February. That is a matter of incontention. I think there's conflicting evidence on that point. Dr. Chu himself... Okay, let's assume that he did the partial work and the dates are something like February 24th. February 22nd, yes. Okay. So then, as I read the record, there's all this stuff that was going on in kind of a two-week period in March. Correct. And all these different people, some under Dr. Chu's supervision, doing substitutions of a variety of rare earth elements. That is correct, yes. So, even accepting that your client did the gal... Gadolinium. Gadolinium. I mean, that's the one he's claiming, but I don't understand. I mean, if Dr. Chu discovered at the same time or a little before that there were other substitutions, complete substitutions of the rare earth element, why is your... Why is Dr. Hoare's subsequent or shortly thereafter discovery of one other? First... Not worthy of a pat. First, stepping back to the partial substitution experiments. Okay. The evidence is very clear, and I think Dr. Chu had to admit this himself, is that you cannot, from a partial substitution in...  Well, let's assume that, by the way. Substitution is a step on the way to the complete substitution, but it's not enough. And that Dr. Chu's role in the partial substitution doesn't make him the sole inventor of the complete substitution. The problem is, it seems to me, that there are two possible ways that Dr. Hoare could be an inventor here. One would be that he came up with the idea of the complete substitution. The second one would be is that he was the one who implemented the testing and saw that it worked and that the complete substitution resulted in the superconductor. As to the first of those, there's conflicting testimony between Dr. Chu and Dr. Hoare as to who first thought up the complete substitution. And I look at the laboratory notebook of March 7th, which is before Dr. Hoare said he thought this up, and that describes the complete substitution. The laboratory notebook doesn't say who thought of making the complete I don't believe either side claims credit for the March 7th, for the listing that you're talking about there in March 7th. No, but it's inconsistent with your client's testimony. It's also inconsistent with Dr. Chu's testimony, which is that he moved straight from partial substitution in February to doing europium and samarium in March 11th or 12th. When you look at Dr. Chu's prior writings on this subject, his prior writings are very consistent in which they say, in which he says, as far as doing this pair-breaking experiment in which you substitute in the magnetic element to break the Cooper pairs that are responsible for superconductivity, he says that those experiments, those pair-breaking experiments involving the substitution of magnetic rare earth elements occurred only after the chemical structure and the chemical formula for the YBCO-123 was known, which was in the March 6th to 8th, depending on which version you actually believe. At trial, then, he testifies that, no, I did pair-breaking before that, but based on my gadolinium experiment, this small fraction substitution of gadolinium, then I immediately conceived that all of the magnetic rare earths would work, and then in March 11th or March 12th, I turned to europium and samarium for a complete substitution. That is belied by his previous writings. Let's assume that Dr. Chu was the one who conceived of complete substitution of the rare earth metals. And is there any room, if we accept that testimony, to consider Dr. Hoare to be an inventor? I think there is, because there are other rare earth elements that I think it's undisputed that Dr. Hoare... No, but my hypothetical was asking to assume that Dr. Chu was the one who thought of the complete substitution of all of the magnetic rare earth metals. And I understand the argument is that the simple idea of the substitution isn't enough for the invention because you didn't know it was going to work, and it was an unpredictable technology. What I'm asking you is if that was the case, that we accept that testimony, that he was the one who thought of the complete substitution, can Dr. Hoare be an inventor under that assumption? I would think so, because obviously Dr. Hoare also had that idea at the same time. I think if you accept Dr. Chu had the idea, the evidence is also clear that Dr. Hoare had the idea. In fact, Dr. Chu himself credits Dr. Hoare in his more contemporaneous writings, he credits Dr. Hoare with doing the complete substitution. When you say in his more contemporaneous writings, I assume that you're referring to the section of your brief where you say Hoare proved his claim to inventorship by clear and convincing evidence, and then your first point is Chu's own writings credited Hoare with creating the magnetic rare earth superconductors, and you rely on a letter of reference. Not only the letter of reference, but also an article that Dr. Chu wrote with respect to Dr. Hoare performing the pair-breaking experiments using complete substitution of gadolinium. So it's also in one of the scientific articles. And if you also look at the timing of all this, I think that's very important, because we have... See, I'm into my rebuttal time, but I'm just going to go ahead. The timing of this, when you look at when these complete substitution experiments occurred, and then look at when the scientific paper is published, March 16th, there's complete agreement that it was prepared on March 16th. Immediately after, there's a lot of evidence regarding the worldwide rush and competition that's going on during this time to create compounds. There's also the timing of the patent application regarding the magnetic rare earths, which occurs on March 26th, which is more than a month after Dr. Chu claims he invented, conceived of, all of the magnetic rare earths. It was incredible to believe, given the pattern and practice of the timing of his patent applications, that he would have waited a month in order to file a patent application involving an entirely new line of these magnetic rare earths superconductors. Well, he wouldn't know that it would work until the experiments had been done. That didn't stop him from filing the patent for YBCO, for an intranet substitution, before he'd ever even created one. Okay, let me ask you one more question here. Let's assume that Dr. Chu's testimony is credited, that he thought was the first one to think of the complete substitution. Let's assume that we disbelieve Dr. Hoare's testimony, that he thought of it, but that we credit the idea that Hoare implemented Chu's idea of the complete substitution. Would that make Dr. Hoare an inventor? I think under the standards for co-inventorship, for joint inventorship, where you have a collaboration of... Well, first of all, under 35 U.S.C. 116, there's no minimum threshold established to be a co-inventor. Yeah, but let's be specific. On that hypothetical, is Dr. Hoare a co-inventor? I think so, because I think there is clearly a collaborative effort of people working together in close proximity, not only... I've read his testimony. He says he supervised the experiments, but I don't see any testimony that he did anything that was inventive or more than routine after the idea was formed to make the complete substitution. Is that fair? I don't think it's fair, because I think Dr. Chu does give Dr. Hoare credit for doing the complete substitution. Are you abandoning... When you say you give him credit, are you abandoning that letter of reference? No, I'm not abandoning the letter of reference. I think the letter of reference is clearly in the evidence, and there was clear testimony from... It is in the evidence. There was testimony from the dean of the college that you do not misrepresent the facts in a letter of reference for promotion and tenure. That's one of the most important moments in a college professor's life, and you better have the facts correct, and you better not credit that person with something they did not do. So it's not like a standard letter of reference. Dr. Chu himself said he did it and that he didn't lie when he said it. Correct. But I'm still confused. If Hoare didn't conceive of the idea of the complete substitution, let's assume that, what is it that he did that was an inventive contribution? Well, he did direct the making of the compounds. He did take that, and if you look at the lab records, you see that there's also the conception that if one of the magnetic rare earths is going to work, then all of the magnetic rare earths will work. And there is clear evidence of this surge of activity that occurs after the complete gadolinium substitution is confirmed, and the evidence is clear that that's on March the 15th. There's evidence of the surge of activity with all the other magnetic rare earths, neodymium, homium, erbium, that could go on, and you get the picture. So I think there is the clear conception that all the magnetic rare earths will work at that point. Okay, why don't we hear from the other side? Mr. Hewitt. May it please the court, Lester Hewitt here for Dr. Chu. The problem here is the district court really didn't make findings that would be helpful to us. This is complicated. There is some conflicting testimony. Maybe the testimony isn't quite as conflicting as the district court thought it was, and we don't have help from the district court in the findings that would be useful to us. So what are we supposed to do? Your Honor, I think we would all have looked and hoped that the judge would have been able to make a final call on each disputed act. However, I believe because it's a clear and convincing standard, the judge held both of the plaintiffs to a clear and convincing standard, and where he felt, which was virtually everywhere, that they couldn't meet the clear and convincing standard, he did not give them credit for a finding, which means he accepted Dr. Chu's testimony. And so the way he will- Yeah, but there isn't just a single conflict here. Take, for example, the reference letter where Dr. Chu says, I was exaggerating, but I didn't lie. And when he says, I didn't lie, that seems to suggest that the work that he specifically stated that Dr. Hoare did or had done under his supervision was an accurate statement of what Hoare did. A couple of things about Dr. Chu.  They're in the record dating back for him to get salary increases. He was Dr. Chu's Ph.D. advisor. He recommended that Dr. Chu- excuse me, that Dr. Hoare become the alternate principal investigator. At a later point, he listed Dr. Hoare first on a couple of papers. He did, and then of course when he made a lot of his writings, he credited the lab and sometimes he credited Dr. Hoare. What Dr. Chu never did in any of the papers was credit himself for anything. He was looking out for the people in his lab. He was writing from the standpoint of the university. There's at least a strong inference that he was indeed giving credit to others rather than himself. Because none of those papers- Yeah, but he also said he didn't lie about it. He said he exaggerated, but he didn't lie. Well, all of these people helped. I think he feels like- he's not a patent attorney. He's an inventor, but he doesn't know anything about patents. That patent application that was filed was his first one. He's thinking in terms back then of just the overall contributions, I think, that they made in the lab. He's giving them credit for- He gave them a lot of money, too, as I recall. Yes, sir, he did. He gave them a great deal of money. He's a generous man. He was generous to them in every way possible. And now it's being used as evidence against him, and I don't think it's right. Wait, if he says something and he says it was an accurate statement but an exaggeration, I mean, it's fair to say that it should be held against him. We don't rule in favor of someone just because he's a generous person. I understand, and I do appreciate that. What I'm trying to say is that we have a record of evidence during the invention period that is very clear as to all of Dr. Chu's very consistent, very high-level intellectual analysis as he went through all the steps to get to the point of all the rare earths. When it came time to do the writings, he wrote all of them very broadly in terms of getting credit, and a lot of credit to Dr. Hoare. But that's a writing after the fact for Dr. Chu, who is the head of the lab and the sponsor of Dr. Hoare in a dissertation. So I think what he's saying is he was exaggerating. He was trying to put his best spin on it. Well, what you're saying is I think that the district court was justified in treating that letter of reference as puffery to cite the 1850s English case on contracts that every one of us read our first year of law school. That's right, sir. The other thing that I think the court focused on in great detail is analyzing the record of the lab notebooks and the testimony of the witnesses and what he found based upon that evidence, which I would call the direct evidence. He found that neither Hoare nor Ming made a clear and convincing case. This court has pointed out some of those issues today. For Ming, they're the same issues with respect to Hoare. Hoare never wrote anything. Dr. Chu wrote all the papers. Dr. Hoare said he reviewed them. There's no evidence he ever did that. One of the papers, incidentally, two of the papers on February 6th, one of them Exhibit 48, had reference to the fact that Chu had filed a patent application. Dr. Hoare said he didn't read the footnotes. But I am, and I would like to, subject, of course, to the court, to go through the actual documents of the partial substitution if we get a chance. Did you have a question, sir? I'm not sure, just speaking for myself, I don't think the partial substitution does it. I don't think that that inevitably leads to the complete substitution, and in my mind the complete substitution is a separate invention and that we need to focus on the question of who thought that up, whether there's evidence that Dr. Hoare participated in that, and whether he did anything else that should make him an inventor here. I can do that. Let's start with the first complete substitutions. The first complete substitutions was not gadolinium. The first complete substitution was europium. Europium is the second most magnetic of the rare earths, and that was done by Dr. Chu. And do you have a date on that? Yes, ma'am. And what was the corroboration? I'm just getting to grab it. So the partial substitution work was done over February. Then at the end of February, after that partial substitution work was done, Dr. Hazen called and told Dr. Chu that the substance, the black phase, that Dr. Chu was trying to determine was this 1,2,3. Chu had already done all the partial substitution work in this YBCO214 because he knew it had the black phase, and he believed the black phase was superconducting. So he didn't want to wait for the 1,2,3. So on February 28th, he learned 1,2,3, but he testified it wasn't until March 7th that the lab had 1,2,3 available so he could do full substitutions. So on March 7th, Chu has a series of formulas written out on documents A5059-60, also dated March 7th. Those are a list of complete substitutions. We don't know that that laboratory entry was the result of Dr. Chu's idea, do we? Your Honor, I don't think it could be anybody else, and here's why. First of all, we have to keep in mind that Dr. Hoare did not come on the scene until March 15th, perhaps a few days earlier, when he said, let's do gadolinium, and his reason to do gadolinium was it was the most superconductive. But that's exactly what Hoare did, excuse me, Dr. Chu did in the partial substitution. He did gadolinium. So when the 1,2,3 became available as of March 7th, those formulas were written and on March 11th. Yeah, but you're not really responding to my question. My question is, I'm very familiar with the March 7th entry. Okay, I'm getting there. It does show complete substitution. Right. The question is, who's responsible for that entry? Well, of course, we don't know for sure, because Ru-Ling Ming wrote it. Dr. Chu claimed it. There's nothing written about Dr. Chu on there. If you go, to finish the complete substitution point I need to make, the second and third most magnetic rare earths after gadolinium was europium and samarium. And Dr. Chu turned to having those two complete substitutions made, and those tests were listed on the March 7th work I just referred to, and those were tested on a series of dates beginning March 11th. Right, and as I understand it, Dr. Hoare is not claiming to be a co-inventor with respect to the europium and samarium. You're exactly correct. He's not. Mr. Beverly tried to get Mrs. Ming to claim them, and Mrs. Ming, there's no evidence that she ever put together any compounds. She was on the material science side. So, it didn't fit at all. The court found, in essence, in a finding, that the work of europium and samarium undercut Dr. Hoare. And the reason the court found that was Dr. Hoare didn't enter the picture until March 15th, and this work, complete substitution work, was done first. Let me ask you, I'm getting a little confused here. Sure. We're just talking about complete substitution. So, if we accept, I think what you're saying is, we can credit Dr. Tu with complete substitution of these other. Yes, ma'am. But what about gadolinium? And even if that's true, if it parses out that we credit him for the others, but feel that the record supports crediting Dr. Hoare with gadolinium, does that make him some sort of co-inventor? Absolutely not. Why not? And I'll tell you why. Dr. Tu started his partial substitution work with gadolinium because it's the most magnetic of the rare earths. And his point and thinking was, if gadolinium worked in the partial substitution, then all of the rare earths would work. But let's assume that that's not enough, okay? Because there's something, it's much more significant to make the complete substitution. It doesn't follow automatically from the partial substitution. Let's assume that. And so focus on the question of whether Dr. Tu was solely responsible for the complete substitution of gadolinium, for example. All right. Well, first of all, I think the record supports the partial substitution work being the gateway to all the complete substitution work. But perhaps not enough. But understanding your point, if you were going to start out and do the complete substitutions, you might do gadolinium first, and that's what Dr. Hoare did. However, Dr. Tu, with his background and his belief that gadolinium had already been tested, he turned and did complete substitutions on the second and two most magnetic rare earth elements, which are europium and samarium. So is it your view, and is there anything in the record to support, that if we credit Dr. Tu with those two that you've discussed, that it would have been known once skilled in the art if those two worked, then certainly gadolinium, including the work done on partial substitution, would work as well? So is it your position that there was nothing inventive about Dr. Hoare's work with gadolinium, given what Dr. Tu had done with the other rare earth elements? Well, that's exactly right. Where is it in the record? Well, Dr. Tu testified to that. He testified that once he decided that gadolinium would work, then he decided that all the other rare earths, and so he said in his testimony, because he believed gadolinium would work, he moved on to europium, the second most magnetic, and then to samarium, the third most magnetic, and it's like a series of dominoes. So are you conceding that the testimony showed that Dr. Hoare was the first one to think of substituting gadolinium, a complete substitution of gadolinium? No, and I'll tell you why. Because Dr. Hoare claimed he did that, but Dr. Tu also testified that he did the rest of that work, too. What do you mean the rest of that work? I mean all the other rare earths. But I'm just focusing on this one, and it may be, I understand the argument that the substitution of gadolinium necessarily followed from success with respect to europium and samarium. Put that aside. The question is do you agree that the record shows that Dr. Hoare was the first one to think, to order the substitution of gadolinium? No, I don't. You don't? Okay. I don't. Why not? Well, because I don't think it's corroborated. The only person that mentioned anything that said that Dr. Hoare suggested the gadolinium was Mrs. Main. And the court found that Mrs. Main was such an interested party, and she totally is, and the record's full of that, is that she couldn't support that. Dr. Tu said he came back after europium and samarium, and he did gadolinium, and he did all the rare earths. The point is— But Dr. Tu did not testify that he was the first one to think of substituting, doing the complete substitution of gadolinium? Dr. Tu testified that he was satisfied. No, no, no. Okay. Answer my question. Did Dr. Tu testify that he was the one who thought of the complete substitution of gadolinium? Yes. It's just a matter of putting it in the right order. He did all of them. Look, the surge— While you're talking about testimony, I'm sorry to take you out of this, but I just want to take you back to those March 7th lab notes. You said there was nothing to demonstrate that those were his notes, but wasn't there testimony by him about that? Oh, yes, absolutely. The testimony by Dr. Tu on the March 7th formulas— I thought I'd seen it. It's in A4144. 4144. Yes, sir. Then with respect to europium, I'll just give you the numbers, A5703, 5702, samarium 5692. With respect to gadolinium, Dr. Tu asked the lab to test gadolinium, and he testified to that at A4151. This is complete substitution? Yes, sir. He had already done the second and the third. What Dr. Hoare concluded after he supposedly did gadolinium was that they all would follow. That conclusion was made by Dr. Tu earlier based upon his partial substitutions. Dr. Tu testified that that partial substitution work was a standard practice, and he drew scientific inferences from that. And when the 123 became available, he then began the complete substitution work. In essence, you're saying, and he seems to be saying, that if I knew that if the second and third would work, then the most magnetic would work. He did. Plus, he knew that based upon his partial gadolinium. Right, right. That's right. Did he take credit for ordering the complete substitution of gadolinium? Did he say that? A4151. 4151? Yes, sir. That's the note I have. We refer to it in the Tu brief at 20. Where does he say that? I'm sorry. That's just a note I have. I don't see where he says he thought of substituting the complete substitution of gadolinium or that he ordered it. Well, okay. I'm sorry if my page number is wrong. I don't have another page number here on the gadolinium. I have several other pages for the test, but I don't have another page number for Chu. We can check that and give it to you. What I'm trying to emphasize. Well, I assume you're talking about where the question, or did Dr. Hoare have that test made? And he answers, because this whole series was made by, proposed by me and then tests were made. And I assume that's talking about the complete substitution since Dr. Hoare, but that's all I can get out of it. Dr. Chu testified that he looked at this in two steps. The partials were the predecessor to the completes. Once he felt the partial on gadolinium worked, he said he knew the complete would work. So he didn't start with gadolinium because it's the most magnetic, because he was convinced his gadolinium test would work. Where does he say that in the record? What's that? That I started, what I had synopsized for you before, that I started with the second and third because I knew if they worked, the first would work. No, he didn't say that. He just said he knew the first and the second would be the next two to test because he felt he had already tested the gadolinium. What he said was, his testimony is found in A3976 where he refers to going to the second most magnetic where earth. So as I read all the testimony in the case and understood Dr. Chu, his partial substitution work opened the doors to the complete substitution. And that is where he says it on A3976, including complete substitution. And he therefore was so confident that gadolinium would work, he went ahead and did the first two in europium and samarium and then they did the others. And it wasn't a surge incidentally by Dr. Hoare. Dr. Chu was speaking at Harvard on March 16th and he was trying to get all this work done, as he testified, so he could put it on a transparency to disclose to the world these new rare-earth substitutions. So from the standpoint of Dr. Chu as the physicist and as the researcher here, I believe his testimony is very clear that he was convinced that he went through this in a proper order and that he did indeed have complete substitution in mind because he did the europium and samarium. Well, having it in mind and telling people to make the substitution are not necessarily the same thing. Your Honor, if he had it in mind and there's a written record, he had all of them in mind. Yeah, but having it in mind, he didn't know that it was going to work. This is a complex technology. I don't think that the conception likely would be complete until it was actually done. And if he thought up the substitution of gadolinium and ordered that it be done and it worked and he was aware of it, that's probably enough to make him the sole inventor if nobody else made a significant contribution. Dr. Hoare, excuse me, I believe that if the 1, 2, 3 had been available at the time when Dr. Chu started his work in February, he would have done gadolinium with a complete substitution. But he didn't have 1, 2, 3. He did what he could to set the stage for the next round. What I'm saying is that in his scientific mind... But not in his mind. Where did he say make the gadolinium substitution? Well, Your Honor, I thought it was there. I know he did say it. I'll just have to get the site for you. I don't have it. The test, the partial substitution tests that were run on gadolinium have numbers A-43-1. Just in the interest of clarity, I think your associate or partner wants to hand you a page. Because I'd like to know a definitive answer. It must be my handwriting. It's on A-41-51. 41-51. Perhaps I misspoke. Did I say 41-31 before? No, I thought you said 41-51. This whole series was made by him. Yeah. You didn't say that before. You're relying on because this whole series was made by, proposed by me and then tests were made. And he says you, it was time to run all the rear earths. So you're saying it was covered. Yes. Now, if you look at March 7, the day Dr. Chu testified was the day 1-2-3 became available. These are the page numbers A-5059-A-5060. The number one formula was for europium. Samarium was the third one down. On the second page, number five was the formula for gadolinium. 1-2-3 complete substitution. This is Dr. Chu's work. It's a week before Dr. Warren's. I don't know whether it's Dr. Chu's work. Sir? There isn't any testimony connecting him to that particular entry. You're right. There's not testimony except his own. No. He himself didn't testify that he was responsible for that entry in the lab notebooks. Actually, I thought he did refer. Well, tell me where. On March 7th. I didn't find that. Here's a question I asked you before. Well, the point I can make is that because europium was listed first, I think it was very clearly that was Dr. Chu's work because that's where his state of mind was at that moment. Yeah, yeah. And he proceeded then to the europium and so on, and samarium, and then he went on with the others. But you told me you could verify that those were from testimony, and I thought I had seen it, that that was his work, so we'd like a record cite to it. His claim to the March 7th? Yeah, in his testimony. A4144. 4144. We're on the page. I don't have the page. He talks about March 7th, but I don't see that he talks about the lab notebook entries. And it says actually March 7th was already known. That could be the reference to the 123. It sounds as though it's a reference to 123. I think that's probably right. These pages of March 7th that he did testify to fit in a time with the first europium test being a few days later on March 11th. So I feel like if a connection is made, there's a rational connection between this listing of formulas for complete substitution with europium first and the fact that europium was done by Dr. Chu on March 11th. Well, it tends to, those lab notebook entries on March 7th, even though there appears to be no testimony in which Dr. Chu said he was responsible for those entries, the fact that those entries appeared on March 7th does appear to be inconsistent with Dr. Hoare's testimony that he came up with the idea on March 11th. That's correct. The earliest entry that we found for Dr. Hoare, I think claimed, was on A4810, which is gadolinium 901. That dates March 12th. That's after Dr. Chu had done all the partial substitution and done the europium and a test had been run. All of a sudden we have this entry that Dr. Hoare claims, which incidentally he said was a wild idea, on March 12th. I think these people were working very closely in the lab. I don't know why Dr. Hoare came in and decided to start doing this. In my mind and my belief that based upon all the science and analysis of Dr. Chu, there's no question that everything he did was leading to the complete substitutions of all the rare earths. He began with europium and samarium to that end. The fact that europium and samarium worked, of course, spurred him on to do all the other rare earths. So when Dr. Hoare comes in four days later and starts testing rare earths, he's actually getting on the train that's already left the station. But is there any testimony that Dr. Chu told Dr. Hoare to make those substitutions? No. Dr. Hoare and Dr. Chu were not collaborative. That's clear. Mrs. Ming was the go-between. She knew this was going on and Mrs. Ming had a document. I just think this is an interesting document because she pulled it together and she couldn't testify to it, but it's A4976. It's dated March 15, 1987. I asked Mrs. Ming about this document because it was clear to me in looking at it that she connected the dots. The first series of entries there are the GB901, which is the full substitution of gadolinium on March 15. Underneath that, if you go down to 401 and 402, and the reference over there to 7555 and 8858, those are the temperatures of superconducting in the two partial substitutions done by Chu, and the partial substitutions were written there, the ones that he did. She pulled that out and put it all on the one page on March 15 because she tied it together as being the material scientist. She knew what Dr. Chu was doing. She could give no testimony to this document except it's her handwriting. I'm convinced that's what it is. We're way beyond our time, so thank you. Well, we still have one minute each for response, unless there are questions. Thank you for your time today, Your Honors. You asked me for citations to the Dr. Forster testimony. I would point you to pages 3461-62 and 3478, where he talked about Ms. Means' contribution to the development of this invention as being non-trivial, involving independent expertise and thought, and beyond the normal level of others in the lab. There is where the patents claim a method for making the compound, the chemical compound, that the person who's responsible for making that compound and creating the method should be credited as an inventor. The clear and convincing, in fact the undisputed evidence, is that Ms. Ming was responsible for all of the steps that are described in the patent and therefore made an inventive contribution to the inventions described in the two patents. Any questions? Thank you for your time today. Very briefly in rebuttal, Mr. Hewitt claims that Dr. Hoare did not enter the picture until March the 15th. The evidence actually shows that he enters the picture with respect to complete substitution March 11th or 12th. There's no doubt about that. With respect to the partial substitutions, there is no doubt that Dr. Hoare did not enter the picture until March the 15th. Mr. Hewitt talks about all these experiments that were done on partial substitution, but there's no evidence of anything other than one possible partial substitution with gadolinium. There are tons of formulas that are written in the lab notebook, but there is no evidence whatsoever that any of those other than possibly gadolinium were ever actually created or tested. So there was not a long line of partial substitution experiments leading to these europium and samarium substitutions. But the problem with those March 7th notes is that they do show a complete substitution using gadolinium, and that is before even under your timeline Dr. Hoare entered the picture. That's a primary problem. That is a problem, but there's nobody that is actually claiming credit for that March 7th. Dr. Chu does not claim credit for that particular lab notebook, and neither did Dr. Hoare. So the formulas are out there. It's hard to know what to make with that particular evidence. But with respect to europium and samarium, which Dr. Chu does claim, I think it remains a question is why would you go straight to europium and samarium without confirming gadolinium first as a complete substitution of gadolinium as a superconductor, which tends to show that whoever was doing the europium and samarium experiments, which Ms. Main did claim she did, didn't really understand magnetic rare earths, which she said she did not. She did not know which rare earths were magnetic and which were not, and she really didn't know anything about pair breaking. So I think there's certainly an inference there that whoever did those europium and samarium substitutions didn't really understand what they were doing scientifically. Last point with respect to corroboration of gadolinium, there's not only Ms. Ming's testimony, but there's also the testimony of Jeff Bechtel, who was a graduate student in the lab, who also confirms that he spoke with Dr. Hoare about gadolinium substitution during this time frame. So your testimony about Ms. Ming not understanding can also be read to indicate that Dr. Chu is the person who directed it. That is a possible inference, I would agree with that. But I think the more logical inference is that they did not, whoever was doing that did not understand what was going on. Thank you for your time. Thank you. We thank both counsel when the case is submitted.